**E-FILED**
Thursday, 17 January, 2008  10:41:59 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

---

| | | |
|---|---|---|
| **ST. JOSEPH-OGDEN COMMUNITY** | ) | |
| **HIGH SCHOOL DISTRICT NO. 305,** | ) | |
| | ) | |
| **Plaintiff ,** | ) | |
| **v.** | ) | **Case No. 07-CV-2079** |
| | ) | |
| **JANET W., Individually and as Parent and** | ) | |
| **Next Friend of M.W., and the ILLINOIS** | ) | |
| **STATE BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#13) filed by Plaintiff, St. Joseph-Ogden Community High School District No. 305 (District).  This court has carefully considered the arguments of the parties and the entire record in this case.  Following this careful and thorough consideration, the District's Motion for Summary Judgment (#13) is GRANTED.

## FACTS[1]

M.W. began attending St. Joseph-Ogden High School (High School) as a freshman the fall of 2005.  On September 24, 2005, M.W. attempted suicide.  He was hospitalized and subsequently treated for a period of time at the Pavilion, an institution that provides psychiatric services as well as some educational services.  On November 3, 2005, M.W. again attempted suicide, was hospitalized, and admitted to the Pavilion for treatment.  M.W. received counseling from Christopher

---

[1]  The facts recited are taken from the Statement of Undisputed Material Facts provided by the District, the additional facts provided by Janet W., and the administrative record filed by the Illinois State Board of Education.

Ochs and also received treatment from Dr. John Beck, a psychiatrist.  M.W. eventually returned to the High School and attended classes.  During the spring of 2006, M.W. had some discipline problems, particularly during his biology class.  He was suspended twice for making comments, verbally and in writing, which were considered to be inappropriate and threatening.  However, M.W. finished the year with passing grades in all of his classes, including his geometry class, which was an accelerated math class.

M.W. began his sophomore year at the High School the fall of 2006.  On October 3, 2006, M.W. was suspended.  He had written a paper for an assignment in his social studies class which included a statement considered to be threatening.  Following an expulsion hearing, M.W. was expelled from the High School for the remainder of the 2006-2007 school year.  M.W. subsequently attended the READY program, an alternative school for students with behavior problems.  The District had recommended that he attend this program and paid his tuition.

On November 27, 2006, M.W.'s mother, Janet W., requested a special education evaluation. On November 28, 2006, Janet W. wrote a letter to Victor Zimmerman, the superintendent of the High School.  In the letter, Janet W. protested the expulsion and stated that she wanted M.W. returned to the High School immediately.  Janet W. also stated that she had been denied "[i]nformation/access/assistance" concerning state law and special education services.  Janet W. asked that her letter be forwarded to the State Board of Education.  After the State Board of Education received the letter, it appointed Robert Lehrer as the Impartial Hearing Officer (IHO) assigned to hear the case.

The District then proceeded to determine if M.W. qualified for special education services. A meeting was held on December 5, 2006.  At the meeting, Janet W. stated that she felt that, because

of the events of the 2005-2006 school year, M.W. should have been determined to have a mental illness disability, should have had an individualized education plan (IEP), and should be protected by the special education laws. Her requested resolution was that M.W. be returned to the High School and the expulsion be removed from his record. Zimmerman informed her that the solution she requested was not acceptable.

On December 28, 2006, the IHO entered an Order. He determined that M.W. could not challenge the disciplinary action taken against him under the Individuals with Disabilities Education Act of 2004 (IDEA), 20 U.S.C. §§ 1221 et seq. This was because the District had not determined that M.W. suffered from a disability prior to imposing discipline. The IHO noted that, in fact, no assessment was requested until approximately six weeks after the expulsion. The IHO also concluded that there was no evidence that the District had knowledge prior to the expulsion that M.W. was a child with a disability. The IHO therefore concluded that M.W. could not legitimately claim any rights under the IDEA in connection with any disciplinary action taken by the District. The IHO, however, determined that this conclusion did not call for termination of the due process proceeding, as requested by the District. The IHO determined that M.W.'s request (through his mother) for a special education evaluation should proceed and, if the District determined that he did not suffer from a disability under the IDEA, he would be entitled to a due process hearing to contest that determination. The IHO stated that, in the meantime, M.W.'s placement had to remain at the READY program.

On January 24, 2007, an Eligibility Determination Conference was held to determine whether M.W. qualified for services under the IDEA. Present at the conference were: Zimmerman; Ryan Mitchell, school psychologist for the Rural Champaign County Special Education Cooperative

(RCCSEC); Anthony Buser, school social worker for the RCCSEC; Jennifer Armstrong, special

education department chair at the High School; Susan Pensinger, one of M.W.'s teachers at the High

School prior to his expulsion; Chad Uphoff, principal at the High School; Scott Hogan, executive

director of RCCSEC; Janet W.; Mary H., M.W.'s sister; and M.W.  At the conference, Mitchell and

Buser presented information and test results regarding M.W.  In assessing whether M.W. was

eligible for services under IDEA based upon "emotional disturbance," school officials utilized a form

prepared by RCCSEC and determined that he was not eligible.

On January 25, 2007, M.W., through counsel Jude Redwood, filed a Complaint against the

District and Zimmerman in this court in Case No. 07-2011.  M.W., by his next friend Janet W.,

alleged that, on or before October 3, 2006, he turned in a homework assignment entitled "Who Are

You?" to his social studies teacher, Mr. Kieffer.  Plaintiff alleged that, in this assignment, he wrote,

"I plan to take over the world as soon as I get Becker on my side; first to be destroyed is Canada.

As soon as I take over the world I plan to kill . . . or something that won't get me in trouble . . . all

the teachers that gave me F's; fair warning Mr. Keefer [sic]."  M.W. alleged that he was expelled for

the remainder of the 2006-2007 school year and was attending the READY alternative program, with

tuition paid by the District.  In Count I, M.W. alleged that his First Amendment rights were violated.

In Count II, M.W. alleged a violation of equal protection.  In Count III, M.W. alleged a violation of

the Illinois School Code and the High School's Student Handbook.  On January 30, 2007, Plaintiff

filed a Motion for Preliminary Injunction and a Memorandum of Law in support.  M.W. requested

a preliminary injunction requiring the District and Zimmerman to immediately allow him to re-enroll

in the High School and to make up any missed work.  This court set a hearing on the Motion for

Preliminary Injunction for February 27, 2007, at 9:30 a.m.

4

In February 2007, a due process hearing was held before the IHO regarding the District's determination that M.W. was not eligible for special education services.[2]  The IHO determined that the sole issue to be decided was whether M.W. was eligible for special education services because he suffers from an emotional disturbance as defined in 34 C.F.R. § 300.8(c)(4).  Voluminous documentary evidence was presented to the IHO including grade reports and disciplinary records from the High School, as well as medical records and records from the Pavilion regarding M.W.'s suicide attempts and treatment.  Testimony was also heard over the course of several days.  Janet W. and M.W. proceeded pro se at the due process hearing.

At the hearing, both the District and Janet W. called numerous witnesses to testify.  Janet W. called Dr. Beck and Christopher Ochs as witnesses.  Dr. Beck testified that he began treating M.W. during his first hospitalization at the Pavilion.  Dr. Beck testified that, at that time, M.W. did not describe himself as depressed and Dr. Beck thought his suicide attempt may have been more of an adjustment reaction.  After the second suicide attempt, he was concerned that M.W. was suffering from clinical depression and prescribed an anti-depressant medication for M.W.  He continued seeing M.W. on a periodic basis after M.W. left the Pavilion.  Dr. Beck's notes from these visits were admitted into evidence.  One of the visits occurred on April 18, 2006.  Dr. Beck's notes from that visit stated that M.W. reported that things were going fine.  Janet W. reported, however, that M.W., who did not yet have his driver's license, had taken the family car on more than one occasion without permission.  Dr. Beck's notes stated that his assessment was "Major Depression, single

---

[2]  The IHO denied the District's motion to dismiss the proceeding, rejecting its argument that the only issue raised in M.W.'s due process hearing request (the letter dated November 28, 2006) was a challenge to the discipline imposed by the District, an issue the IHO determined was not properly before him.

episode" and "Oppositional-defiant features, rule out Oppositional-Defiant Disorder."  Dr. Beck testified that the issue of a possible oppositional defiance disorder "just kind of went away, and there weren't any more such instances," so this diagnosis was not used again.

The next visit occurred on July 18, 2006.  Dr. Beck's notes stated that they discussed that M.W. had stopped taking the anti-depressant medication.  Dr. Beck's notes also stated that M.W. was doing well.  Dr. Beck stated that M.W. reported that his spirits had been good and he finished the school year with good grades.  Dr. Beck's notes stated that he discussed with M.W. and Janet W. "signs and symptoms they should look for that would indicate that his depression was returning." Dr. Beck's notes stated that his assessment was "Major Depression, Single Episode - in remission." Dr. Beck's notes also stated that M.W. could continue off his medication at his and his mother's request.

Dr. Beck testified that he saw M.W. on November 13, 2006, after M.W.'s expulsion.  Dr. Beck testified that M.W. appeared "calm and pleasant."  He testified that M.W. was experiencing frustration with the incident at school but did not describe being depressed.  Dr. Beck testified that he last saw M.W. on January 3, 2007.  Dr. Beck testified that, on that date, M.W. and Janet W. requested that M.W. not have any more appointments. Dr. Beck testified that Janet W. told him that M.W. was "doing great" and had "held up real well."  Dr. Beck testified that M.W. did not seem depressed and "did not appear to be displaying any suicidality nor any threat," so he agreed with their request that no further appointments be scheduled.  Dr. Beck's notes for this visit again stated that his assessment was "Major depression, single episode, in remission."  Dr. Beck testified that "remission" was a term he used to say the symptoms have resolved.  He testified that M.W. was without symptoms of depression and in remission since July 2006.  Dr. Beck testified that, in his

6

opinion, M.W. was not suffering from an "emotional disturbance" when he saw him on January 3, 2007.  Dr. Beck explained:

> It was reported to me that he was doing great, that he was holding up well.  He was working on not being isolated.  He would get together with his friends on weekends.

> [M.W.] denied feeling depressed or suicidal.  It was not reported that he was depressed nor was it–nor was it reported that he was suicidal, and they did indicate that he had some frustration again over being isolated from school friends and school functions, but that's all that was reported to me at that time.

Christopher Ochs testified that he is a licensed clinical professional counselor and provided counseling services for M.W. during and after his admission to the Pavilion.  He had regular counseling sessions with M.W. until July 17, 2006.  At that time, Ochs determined that there were no symptoms of depression.  He conducted a global assessment functioning (GAF) test and determined that M.W.'s score was 74.  Ochs explained that a score of 74 meant that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors."  Ochs further explained that there was "no more than slight impairment in functioning, so in short form he presented as stable."  Ochs testified that M.W. reported that he was able to establish relationships with his peers and had positive relationships with adults.  Ochs testified that M.W. "does seem to have difficulty expressing his feelings."

Ochs testified that he met with M.W. on October 14, 2006, after M.W.'s expulsion.  Ochs testified that M.W. described the paper which led to his expulsion "as somewhat of an impulse."

Ochs testified that "it was probably bad judgment on his part to put something down like that." Ochs wrote a letter dated January 14, 2007, prior to the eligibility hearing, which was provided to Buser. In the letter, Ochs stated that M.W. had "completed treatment on 7/17/06 reporting no symptoms and ability to maintain a stable mental status." Ochs stated that, during treatment, M.W. "often discussed his social activities and increasing positive relationships with peers." Ochs also stated that, at his meeting with M.W. on October 14, they "discussed accountability and the impact of his decision-making."

Buser testified that he works for the RCCSEC as a school social worker and is assigned to two school districts. He spends two days a week at the High School. Buser testified that he conducted a social/emotional study of M.W. prior to the eligibility conference. He met with Janet W. on three occasions, met with M.W. and also gathered information from teachers. In addition, he utilized a psychometric tool, the Behavior Assessment for School Children (BASC). Buser testified that the BASC is about 160 questions which provides information about depression, anxiety, hyperactivity and conduct problems. He asked some of M.W.'s teachers, Janet W. and M.W. to complete the BASC questions. Buser completed a report which listed the results for each person who completed the questions. Buser testified that the majority of the scores fell within the average range. He testified that this included the scores based upon the answers provided by M.W. and Janet W. He testified that, in fact, a couple of the scores based upon Janet W.'s responses fell in the high range for adaptive skills which "would indicate that he didn't have problems" and, rather, excelled. Buser testified that none of the scores fell in the clinically significant range. Buser testified that the BASC was not the "sole evaluative criteria" but that it had a good history and gives "lots of information."

8

Buser testified that, because of the history of suicide attempts and depression, he also had M.W. complete a Children's Depression Inventory (CDI). Buser testified that this was a quick assessment with about 15 to 20 questions which allows the individual to score himself "in areas such as negative mood, interpersonal problems, ineffectiveness, anhedonia, and negative self-esteem." Buser testified that M.W.'s scores were all average, slightly below average or below average. He testified that the scores did not show any areas of concern and validated what he had found in the BASC scores.

Ryan Mitchell testified that he is a school psychologist for the RCCSEC. In preparation for the eligibility conference, Mitchell was asked to evaluate M.W.'s general intelligence, cognitive abilities and academic performance. Mitchell testified that he met with M.W. at the READY program and administered several tests. Mitchell testified that the tests results showed that M.W.'s full scale IQ scores fell in the average to high average range and his verbal abilities fell in the superior range. Mitchell testified that, in addition, all of M.W.'s academic achievement fell in the average to high average range. Mitchell testified that the test scores showed that M.W.'s academic achievement and cognitive ability were commensurate with each other. Mitchell testified that M.W. has a history of good grades in school and does not require specialized instruction. Mitchell noted that M.W. has been placed in advanced classes.

Chad Uphoff, the principal at the High School, testified that he observed M.W. getting along pretty well with M.W.'s peers prior to the expulsion. Uphoff testified that M.W. did not have an inability to learn and, in fact, learned well. Uphoff testified that M.W. "seemed to behave well the vast majority of the time, and then occasionally he would have an inappropriate behavior." Uphoff acknowledged that M.W. "seemed to do big things" and that the inappropriate behavior which

resulted in his suspensions and expulsion was "extreme."  Zimmerman testified that M.W.'s disciplinary situations were serious inappropriate behaviors, but were "isolated incidents at different points in time."  Zimmerman testified that M.W. is a strong student and does not need specialized instruction. Jeffrey Kieffer testified that he felt M.W.'s paper "warranted the attention of the faculty, administration."  Jennifer Armstrong, the special education department chair at the High School testified that she prepared a report regarding M.W. which stated that he has had behavior issues and that his grades had suffered because of the suspensions.

M.W.'s sister testified that M.W. sometimes does not know how to control his anger.  M.W. testified that his social studies paper "wasn't supposed to be serious or anything."  M.W. indicated that he understood there would be a "no tolerance" policy when he returned to the High School and that he would be able to control his actions.  He testified that he was getting "A's and B's right now" and was "doing pretty well" at school.  Gregory Jahiel testified that he was one of M.W.'s teachers at the READY program.  He testified that, on January 16, 2007, M.W. was crying in class and was upset about being in the READY program.  Jahiel testified that M.W. was not academically challenged in the READY program and that many of his peers in the program used drugs and alcohol.

Other witnesses also testified at the due process hearing.  However, the testimony of the remaining witnesses was either not relevant to the issue of whether M.W. was eligible for services under IDEA or was essentially cumulative of the testimony already set out by this court.

Testimony at the due process hearing concluded on February 23, 2007.  On February 26, 2007, M.W.'s attorney, Jude Redwood, filed a Notice of Voluntary Dismissal in Case No. 07-2011, stating that the case was voluntarily dismissed.  This court therefore vacated the hearing set on

February 27, 2007, and terminated the case.

On February 28, 2007, the IHO heard closing arguments from the District and Janet W. Both parties were allowed time to file case law authority. On March 23, 2007, the IHO issued a 42-page decision. In his decision, the IHO was critical of the District for continuing to raise the issue of whether the proceedings should be dismissed. The IHO also indicated that M.W. was at a disadvantage because he proceeded pro se at his expulsion hearing and at his due process hearing. The IHO also stated that he recognized that the disciplinary proceeding resulting in M.W.'s expulsion was not before him, but expressed his opinion that the sanction imposed was "extreme, in that it was extremely disproportionate to the offense." The IHO also criticized at length the procedures used in conducting the eligibility conference, particularly the use of the RCCSEC form in conducting the evaluation. The IHO stated that the procedures used "establish substantial systemic defaults by the District in its understanding and application of IDEA and its implementing regulations." The IHO then went on to determine that M.W. was eligible for services under IDEA because he suffered from an emotional disturbance which adversely affected his educational performance. The IHO specifically found that, because of the suspensions and expulsion, M.W. "was prevented or prohibited from attending class" at the High School. The IHO concluded that the District was required to immediately provide appropriate services to M.W. either at the High School or at the READY program.

PROCEDURAL BACKGROUND

On April 23, 2007, the District filed its Complaint (#1) in this court against Janet W., individually and as parent and next friend of M.W. The District also named the Illinois State Board of Education (ISBE) as a Defendant, stating that the ISBE was the keeper of the administrative

record of special education dispute proceedings.  In the Complaint, the District stated that the action was a timely appeal of the administrative ruling rendered by the IHO.  The District asked this court to reverse the decision and order of the IHO and find that M.W. is not eligible for special education and related services.  On June 20, 2007, Janet W. filed a pro se Answer (#4) to the Complaint.  Much of her Response addressed her dissatisfaction with the District's decision to expel M.W. in October 2006.  However, she also contended that the evidence supported the IHO's decision that M.W. was eligible for special education services under the IDEA.  She asked this court to deny the District the relief it requested and require the District to provide services to M.W.  She also asked this court to expunge the expulsion from M.W's record.

On July 24, 2007, the ISBE filed its Answer (#8).  The ISBE stated that it was submitting a certified copy of the entire record of proceedings before the administrative agency whose decision is being reviewed.  The administrative record was filed in this court under seal.[3]  On August 7, 2007, the ISBE was dismissed as a party to this action.

On September 17, 2007, the District filed a Motion for Summary Judgment (#13).  The District argued that there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law.

On October 1, 2007, Magistrate Judge David G. Bernthal entered a text order.  Judge Bernthal stated that Janet W. can represent herself but cannot represent M.W.[4]  Judge Bernthal

---

[3]  On November 9, 2007, the ISBE filed a supplement to the record which consisted of documents inadvertently not included with the Answer filed on July 24, 2007.

[4]  In Winkelman v. Parma City Sch. Dist., 127 S. Ct. 1994 (2007), the United States Supreme Court recently had before it the question "whether parents, either on their own behalf or as representatives of the child, may proceed in court unrepresented by counsel though they are not trained or licensed as attorneys."  Winkelman, 127 S. Ct. at 1998.  The Court held that

therefore appointed Attorney Ellyn Bullock as guardian ad litem of M.W.  On October 2, 2007, Janet

W. filed a pro se Response (#17) to the Motion for Summary Judgment.  Janet W. stated that,

although the IHO ordered that an IEP be written for M.W. by March 30, 2007, no IEP has been done

because of the appeal.  She stated that M.W. currently has a C average in his classes, which is below

what he should have based upon his abilities and potential.  Janet W. continued to argue that the

evidence presented to the IHO shows that he is eligible for services under IDEA.  Janet W. also

stated that she did not testify at the due process hearing because she did not think it was necessary,

but asked to be allowed to testify before this court.  In addition, Janet W. filed an Objection (#18).

She stated that appointment of an attorney for M.W. was unnecessary and would only cause further

delay.

On November 6, 2007, a status conference was held before Judge Bernthal.  Judge Bernthal

set a response deadline of December 3, 2007, for M.W. to respond to the Motion for Summary

Judgment.  On November 26, 2007, Attorney Bullock filed a Motion for Leave to File Instanter

Affidavit in Lieu of Response to Motion for Summary Judgment (#27).  Attorney Bullock stated that,

as guardian ad litem, she had reviewed the record in this case including the Complaint and Motion

for Summary Judgment filed by the District.  She stated that she had only been able to meet with

M.W. by telephone, with his mother present during the telephone conversation.  Attorney Bullock

stated that she spoke to M.W. by telephone on November 4, 2007, with his mother present.  She

stated that, based upon the conversation, she believed that M.W. does not wish to object or respond

---

parents enjoy rights under the IDEA and can prosecute IDEA claims on their own behalf,
proceeding pro se.  Winkelman, 127 S. Ct. at 2006-07 (2007).  The Court did not reach the issue
whether the IDEA entitles parents to litigate their child's claims pro se.  Winkelman, 127 S. Ct.
at 2007.

to the pending Motion for Summary Judgment.  She stated that she wanted to submit her sworn affidavit in lieu of a response to the Motion for Summary Judgment.  This court granted Attorney Bullock's Motion by text order and her Affidavit (#28) was filed on November 26, 2007.  In her Affidavit, Attorney Bullock stated that M.W. told her that: he is currently in the 11th grade at the High School with a full class load; his junior year is going well; he is not currently receiving special education and that is okay by him; he does talk to the school social worker briefly each week; he is not currently being disciplined by the school; he was depressed two years ago but is not currently depressed and does not have any current disability; and he enjoyed playing football at the High School this year.

On November 29, 2007, Janet W. filed an Objection (#29) to Attorney Bullock's Affidavit. Janet W. disagreed with Attorney Bullock's statement that she would only allow Attorney Bullock to conduct a telephone conversation with M.W.  According to Janet W., Attorney Bullock preferred to conduct an interview by telephone.  Janet W. also stated that M.W. has had an average of two F's per week and is getting a D in trigonometry, has had some problems with inappropriate comments in one of his classes and has had some episodes of depression.

On December 10, 2007, the District filed its Reply (#30).  The District argued that this court should limit its review to the administrative record before the IHO and that there are no material issues of disputed fact that warrant denial of the District's Motion for Summary Judgment.

ANALYSIS

I.  STANDARD

Although this case is before the court on a Motion for Summary Judgment, the standard for reviewing a hearing officer's decision in an IDEA case differs from a typical summary judgment

analysis.  See Schroll v. Bd. of Educ. Champaign Cmty. Unit Sch. Dist. #4, 2007 WL 2681207, at

*3 (C.D. Ill. 2007); Andrew B. v. Bd. of Educ. of Cmty. High Sch. Dist. 99, 2006 WL 3147719, at

*3 (N.D. Ill. 2006).  A motion for summary judgment in an IDEA case "is simply the procedural

vehicle for asking the judge to decide the case on the basis of the administrative record."  Andrew

B., 2006 WL 3147719, at *3, quoting Heather S. v. State of Wis., 125 F.3d 1045, 1052 (7th Cir.

1997).  Despite being captioned a motion for summary judgment, the court bases its decision on a

preponderance of the evidence.  Patricia P. v. Bd. of Educ. of Oak Park, 203 F.3d 462, 466 (7th Cir.

2000); Hoffman v. East Troy Cmty. Sch. Dist., 38 F. Supp. 2d 750, 760 (E.D. Wis. 1999); see also

Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross, 486 F.3d 267, 270 (7th Cir. 2007).  The IDEA

provides that a district court "(i) shall receive the records of the administrative proceedings; (ii) shall

hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance

of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. §

1415(i)(2)(C).  The District, as the party challenging the outcome of the administrative hearing, bears

the burden of proof before this court.  Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221, 375

F.3d 603, 611 (7th Cir. 2004); Patricia P., 203 F.3d at 466-67; Casey K. v. St. Anne Cmty. High Sch.

Dist. No. 302, 2006 WL 2361881, at *8 (C.D. Ill. 2006).

        The Seventh Circuit has instructed district courts to give due weight to the outcome of the

administrative proceedings and not to substitute its "own notions of sound educational policy for

those of the school authorities" whose decision it is reviewing.  Ross, 486 F.3d at 270, citing Bd. of

Educ. v. Rowley, 458 U.S. 176, 206 (1982); see also Patricia P., 203 F.3d at 466.  Due weight

necessarily implies giving some deference to the decision of the hearing officer, particularly in light

of the officer's special expertise in education law.  See Bd. of Educ. of Murphysboro Cmty. Unit

Sch. Dist. No. 186 v. Ill. State Bd. of Educ., 41 F.3d 1162, 1166 (7th Cir. 1994); Brett K. v. Momence

Cmty Unit Sch. Dist. No. 1, 2007 WL 1022004, at * 4 (N.D. Ill. 2007).  Where no new evidence is

taken, this court "owes considerable deference to the hearing officer, and may set aside the

administrative order only if it is 'strongly convinced that the order is erroneous.'" Alex R., 375 F.3d

at 612, quoting Sch. Dist. of Wis. Dells v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002).  In reviewing the

administrative decision, this court must focus on the evidence in the record.  Konkel v. Elmbrook

Sch. Dist., 348 F. Supp. 2d 1018, 1022 (E.D. Wis. 2004).

## II.  REQUEST FOR ADDITIONAL EVIDENCE

In Janet W.'s pro se Response to the Motion for Summary Judgment, she did ask to testify

before this court.  She stated that she did not testify before the IHO because she did not think it was

necessary.  In addition, it appears that she would like to present testimony regarding how M.W. has

been doing at school since he returned to the High School the fall of 2007.

As noted, the IDEA does allow for additional evidence in reviewing a hearing officer's

decision.  See H.H v. Ind. Bd. of Special Educ., 2007 WL 2914461, at *2 (N.D. Ind. 2007).

However, despite the "shall hear additional evidence"language in the statute, courts have construed

the statute to provide district courts with discretion to determine whether to hear such evidence.  See

Stanley C. v. M.S.D. of S.W. Allen County Schs., 2007 WL 4438624, at *1 (N.D. Ind. 2007);

Konkel, 348 F. Supp. 2d at 1020.  In the Seventh Circuit, "district courts are cautioned to not receive

additional evidence beyond the administrative record absent a strong justification for failure to

present such evidence at the administrative level." H.H., 2007 WL 2914461, at *2, citing Monticello

Sch. Dist. No. 25 v. George L. on Behalf of Brock L., 102 F.3d 895, 901-02 (7th Cir. 1996); see also

Konkel, 348 F. Supp. 2d at 1021.  The determination whether to allow additional evidence is "left

to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo." Patricia P., 203 F.3d at 470, quoting Monticello, 102 F.3d at 901-02. This court "cannot change the complexion of this case from one of review to something much different." H.H., 2007 WL 2914461, at *3.

In this case, Janet W. had ample opportunity to present witnesses and evidence before the IHO. In fact, she presented voluminous documentation and called numerous witnesses at the hearing, including Dr. Beck and Christopher Ochs. In her Response, she has not referred to any testimony she could present which would be directly relevant to this court's review of the IHO's decision. This court therefore agrees with the District that the presentation of additional evidence in this case would not be for purposes of review of the IHO's decision but would be for the purpose of a trial de novo on issues not presented to the IHO. This court further agrees that the evidence Janet W. has discussed would be more properly presented as a renewed request for a special education evaluation by the District based upon M.W.'s current circumstances. Therefore, in exercising its discretion, this court concludes that Janet W. will not be allowed to present additional evidence in this case. See Stanley C., 2007 WL 4438624, at *2-4; Konkel, 348 F. Supp. 2d at 1021-23.

### III.  RULING ON ADMINISTRATIVE REVIEW

In its Motion for Summary Judgment, the District argues that the IHO's ruling should be overturned on review because: (1) the IHO lacked jurisdiction over the issue of the District's January 24 eligibility determination; (2) the District was not afforded an impartial due process hearing due to the fact that the IHO exhibited a bias for pro se litigants and, in effect, acted as M.W.'s advocate; and (3) the IHO's decision is erroneous and contrary to law. This court concludes that the evidence

presented to the IHO does not support his determination that M.W. suffers from an "emotional disturbance" which adversely affected his educational performance.  Because of this court's conclusion based upon the evidence, there is no need for this court to decide the other issues raised by the District.

Congress enacted the IDEA to promote the education of children with disabilities.  See Schaffer v. Weast, 546 U.S. 49, 51-52 (2005).  The IDEA requires the District, as a recipient of federal education funds, to provide children with disabilities a free appropriate public education in the least restrictive environment.  Hjortness v. Neenah Joint Sch. Dist., 503 F.3d 1060, 2007 WL 3355734, at *2 (7th Cir. 2007).  The term "child with a disability" includes a child with an "emotional disturbance" "who, by reason thereof, needs special education and related services."  20 U.S.C. § 1401(3)(A); see also R.B. v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 944 (9th Cir. 2007); Hoffman, 38 F. Supp. 2d at 762-63.  The central issue in dispute in this case is whether M.W. met the criteria for being emotionally disturbed.  See N.C. v Bedford Cent. Sch. Dist., 473 F. Supp. 2d 532, 542 (S.D.N.Y. 2007).

The applicable regulation provides:

(4)(i) *Emotional disturbance* means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal

relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal
circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears
associated with personal or school problems.

(ii) Emotional disturbance includes schizophrenia.  The term
does not apply to children who are socially maladjusted, unless it is
determined that they have an emotional disturbance under paragraph
(c)(4)(i) of this section.

34 C.F.R. § 300.8(c)(4).

In this case, the IHO concluded that M.W. exhibited "[i]nappropriate types of behavior or feelings under normal circumstances" over a long period of time and to a marked degree.  In reaching this conclusion, the IHO relied upon M.W.'s suicide attempts and the disciplinary problems which led to two suspensions and his expulsion for the 2006-2007 school year.  This court certainly agrees that M.W. exhibited some serious inappropriate behaviors.  However, it has been held that the "federal regulations make clear that a student is not to be classified as emotionally disturbed merely because of bad behavior that is not connected to an emotional disturbance-the regulations explicitly do not apply to students who are simply 'socially maladjusted.'" N.C., 473 F. Supp. 2d at 544.  The district court in Hoffman concluded that, in order to be considered a child suffering from an emotional disturbance, the child's "behavioral problems must be unusually serious as compared to the majority of his peers and must present a significant impediment to learning."  Hoffman, 38 F.

19

Supp. 2d at 767.

In this case, the evidence presented to the IHO showed that M.W. attempted suicide on two occasions during the fall of 2005.  He was diagnosed as suffering from depression and began taking anti-depressant medication.  However, by July 2006, M.W. was no longer taking the medication and his treating psychiatrist, Dr. Beck, considered his depression to be in remission.  Dr. Beck testified that, when he saw M.W. on January 3, 2007, M.W. denied being depressed or suicidal.  Christopher Ochs, who provided counseling to M.W., also testified that M.W.'s condition was stable in July 2006.  This evidence was corroborated by the evidence that the BACS evaluations, which were completed by teachers as well as Janet W. and M.W., showed that the majority of responses were in the average range and none of the responses were in the clinically significant range.  It was also corroborated by the CDI assessment completed by M.W., in which his answers were all average, slightly below average or below average as far as indicators of depression, and did not show any areas of concern.  Based upon the evidence presented at the evidentiary hearing, this court agrees with the District that there was no showing that M.W. had any of the characteristics described in subsections (A), (B), (D), or (E) of the applicable regulation at the time of the evaluation and hearing.

The real question in this case, however, is whether the IHO erroneously found that M.W. exhibited "[i]nappropriate types of behavior or feelings under normal circumstances" "over a long period of time and to a marked degree."  This court first finds that the evidence of M.W.'s suicide attempts in the fall of 2005 does not support the IHO's conclusion on this point because the undisputed evidence showed that M.W.'s depression had resolved and he was no longer suicidal. The evidence did also show that M.W. had some discipline problems in the spring of 2006, resulting

in two suspensions.  In October 2006, he was expelled for turning in an assignment which was considered to be threatening.  The District argues that these incidents were all isolated incidents, and not outside the norm of high school discipline.[5]  The District therefore contends that the record and testimony show that M.W.'s disciplinary troubles were unconnected, isolated incidents which do not rise to the level of a "marked degree" or "over a long period of time."  This court agrees.

The District has relied, in part, on the decision of the Ninth Circuit in R.B.  In that case, the court noted that the inappropriateness of the student's behavior over the course of two school years, which included physical attacks and damage to property, was "manifest."  R.B., 496 F.3d at 945. However, the court found that the student's inappropriate behavior "was not to a marked degree over a long period of time."  R.B., 496 F.3d at 945.  The court stated that the evidence showed that R.B. had a "habitual history" of "isolated incidents" of misconduct which only reached acute levels during one trimester.  R.B., 496 F.3d at 945.  The court explained that "while R.B. engaged in inappropriate behavior over several years of school, that behavior was 'to a marked degree' only during one trimester of one grade" and therefore could not establish IDEA eligibility on the basis of

_____

[5] The IHO found that the District could not reasonably conclude that M.W.'s inappropriate behaviors were not serious, noting that in its correspondence related to its decision to expel M.W., the District referred to "actions of gross misconduct" and "shocking, inappropriate, or threatening comments."  Similarly, Janet W. has argued that the District has taken inconsistent positions regarding M.W.  She noted that, in response to her lawsuit challenging the expulsion, the District argued that it "was aware of M.W.'s previous threatening statements, his suicide attempts, and his other disciplinary problems in the past" leading it to "reasonably forecast substantial disruption of or material interference with school activities." This court concludes, however, that the District's decision to expel M.W. based upon what it perceived at the time as threatening behavior cannot and does not automatically result in a determination that M.W. has an "emotional disturbance" under the IDEA.  Contrary to some of the arguments made by Janet W., the issue of M.W.'s expulsion is not before this court. Therefore, regardless of the language the District used in justifying the decision to expel M.W., this court must review the decision of the IHO as to the issue of M.W.'s eligibility under the IDEA based upon the evidence presented at the evidentiary hearing.

inappropriate behavior.  R.B., 496 F.3d at 946.

Similarly, in N.C., the court noted that the student, who had a history of having been sexually abused, had been suspended from school three times in less than three months for fighting with other students and for drug possession.  N.C., 473 F. Supp. 2d at 545.  The district court found that the student's "heightened aggression and worsening substance abuse problem do not represent behavior that can be considered appropriate under normal circumstances."  N.C., 473 F. Supp. 2d at 545.  However, the district court went on to find that the student's "drug use and aggressive behavior, without more, are not enough to qualify him for classification as emotionally disturbed–his conduct during tenth grade can be viewed as the type of bad behavior that characterizes social maladjustment, which, by itself, is not covered under the IDEA."  N.C., 473 F. Supp. 2d at 545.  The district court further stated that "while there are certain indications of inappropriate behavior, there is insufficient proof of an accompanying emotional disturbance beyond the bad conduct to merit a finding of emotional disturbance."  N.C., 473 F. Supp. 2d at 545.

In this case, this court must conclude that the evidence of M.W.'s disciplinary problems shows only isolated incidences of inappropriate behavior which are not sufficient to properly conclude that M.W. has an "emotional disturbance" under the IDEA.  This court notes that cases where courts have found the evidence sufficient to support a finding of "emotional disturbance" under the IDEA involved much greater evidence of "inappropriate behavior" than was presented here.  For example, in Johnson v. Metro Davidson County Sch. Sys., 108 F. Supp. 2d 906 (M.D. Tenn. 2000), the student was diagnosed as being bipolar.  Johnson, 108 F. Supp. 2d at 912.  One of the doctors who evaluated the student stated that the student was "one of the most disturbed children that I have ever seen in 35 years."  Johnson, 108 F. Supp. 2d at 910.  This doctor felt that it would

22

be impossible to educate the student in a normal classroom.  Johnson, 108 F. Supp. 2d at 911.  The evidence showed that the student had engaged in extremely impulsive behavior and that one of her manic episodes resulted in her expulsion from school.  Johnson, 108 F. Supp. 2d at 912.  The district court concluded that the hearing officer improperly concluded that the student did not meet the criteria for disability under the IDEA, noting that the evidence was replete with incidents of inappropriate behavior which was related to an underlying emotional disorder.  Johnson, 108 F. Supp. 2d at 917-18.  The district court stated:

> When the observations of [the student's] inappropriate behavior are combined with Dr. Ramage's persuasive diagnosis of bipolar disorder and opinion that her behavioral problems result from this disorder . . . , [the student] clearly demonstrates one of the characteristics indicative of an emotional disturbance.

Johnson, 108 F. Supp. 2d at 918.  The district court also noted that the issue of whether the exhibition of the inappropriate behavior was to a marked degree and over a long period of time was not seriously contested in that the record demonstrated severe behavioral problems over the course of the student's lifetime.  Johnson, 108 F. Supp. 2d at 918.

Another example is Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist., 145 F.3d 95 (2d Cir. 1998).  In that case, the student was born in Thailand and lived in an orphanage until the age of four, when she was adopted by her parents and came to the United States.  Muller, 145 F.3d at 98.  At that time, she had no verbal abilities and could speak neither English nor Thai.  Muller, 145 F.3d at 98.  The student understandably had difficulties in school from the beginning.  Muller, 145 F.3d at 98.  When she was in the ninth grade, the student attempted suicide and was

diagnosed with conduct disorder and depression.  Muller, 145 F.3d at 98.  During her residential treatment, the student was also diagnosed with post traumatic stress disorder, delayed, "related to childhood deprivation/adoption."  Muller, 145 F.3d at 98.  Attending to the student's depression was one of her treatment goals, and the professionals at the residential treatment center recommended that the student "remain in small group settings in which she could receive much needed emotional support and individualized attention."  Muller, 145 F.3d at 98-99.  They "cautioned that [the student] was likely to relapse if she were readmitted to the public school system."  Muller, 145 F.3d at 99.  The school district in Muller concluded that the student did not meet the eligibility criteria under the IDEA, a conclusion upheld by a hearing officer and a state review officer.  The district court disagreed, finding that the student's emotional and behavioral problems adversely affected her academic performance so that she qualified as "emotionally disturbed" under the IDEA.  Muller, 145 F.3d at 101.  On appeal, the Second Circuit agreed with the district court.  The court stated that "the district court was as well-positioned as the state administrative officials to determine [the student's] eligibility."  Muller, 145 F.3d at 102.  The court found that the record demonstrated that the student exhibited a generally pervasive mood of unhappiness or depression for a long period of time and to a marked degree, noting that nearly every doctor and psychologist who examined her stated that she exhibited symptoms of depression.[6]  Muller, 145 F.3d at 104.  The court also listed numerous examples of the student's inappropriate behavior and stated that, in combination, "they provide more than an adequate basis for the district court's conclusion that [the student] exhibited 'inappropriate types of behavior or feelings under normal circumstances.'"  Muller, 145 F.3d at 104.

_____

[6] As noted previously, both Dr. Beck and Christopher Ochs testified that M.W. was no longer exhibiting any signs of depression and was no longer receiving any medication or treatment.

In this case, the professionals who had provided treatment to M.W. testified that he was no longer suffering from depression, was not receiving treatment and was "stable."  In addition, the evidence of M.W.'s disciplinary problems showed much less "inappropriate behavior" than recounted in Johnson and Muller.  This court therefore concludes that, unlike Johnson and Muller, the evidence in this case does not show that M.W. was suffering from an "emotional disturbance" under the IDEA.  See also Bd. of Educ. of Montgomery County v. S.G., 2006 WL 544529 (D. Md. 2006), aff'd, 230 Fed.Appx. 330 (4th Cir. 2007) (student found to have "emotional disturbance" under the IDEA where the student reported hearing voices on a daily basis telling her to do bad things and was diagnosed as having a psychotic disorder).

In any case, this court agrees with the District that, even if M.W. has an emotional disturbance under the IDEA, the evidence presented to the IHO did not show that it adversely affected his educational performance.  M.W. ended the 2005-2006 school year with passing grades, including a passing grade in geometry, an accelerated math class.  Moreover, at the time of his expulsion in October 2006, M.W.'s grades were two A's, one B+, one B, one C+, and one C.  These grades included an A in Algebra II.  The most that can be said is that his grades were perhaps not reflective of his full potential.  However, M.W. received passing grades in his classes, including an accelerated math class, which suggests he was receiving an "educational benefit" from his classes as understood under the IDEA.  See Hoffman, 38 F. Supp. 2d at 764.  Also, at the hearing, M.W. testified that he was getting A's and B's at the READY program and was "doing pretty well."[7]

---

[7]  While the READY program was perhaps not academically challenging to M.W., it has been held that school districts "are not required to do more than to provide a program reasonably calculated to be of educational benefit to the child; they are not required to educate the child to his or her highest potential."  Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M., 356 F.3d 798, 802 (7th Cir. 2004).

The IHO determined that M.W.'s emotional disturbance adversely affected his educational performance because he was prevented or prohibited from attending classes at the High School because of the two suspensions and the expulsion.  In reaching this conclusion, the IHO relied upon Johnson.  This court has already concluded that the facts in Johnson are distinguishable from the facts here.  In Johnson, the District argued that the student's emotional problems did not adversely affect her educational performance because the record indicated that she was, in many ways, making reasonable progress in school.  Johnson, 108 F. Supp. 2d at 918.  The court rejected this argument because it determined that the problem was that the student had been unable to remain in school, noting that she had been expelled from two different schools.  Johnson, 108 F. Supp. 2d at 918-19.  In Johnson, however, the evidence showed that the student's behavioral and emotional problems made it impossible for her to remain in a regular classroom and the court relied on her "inability to remain in school while in a regular school environment. " Johnson, 108 F. Supp. 2d at 911, 918-19.  In this case, the District expelled M.W. for including a threat in a written assignment.  However, there was no evidence that M.W. was unable to learn or participate in a regular classroom; in fact, the record is to the contrary.  Moreover, M.W. testified at the hearing before the IHO that he would be able to control his actions when he returned to the High School.

In both R.B. and N.C., cases arguably involving more severe inappropriate behaviors than were present in this case, in addition to finding that the students' inappropriate behaviors did not warrant a finding of eligibility under the IDEA, the courts concluded that the inappropriate behavior did not adversely affect the students' educational performance.  See R.B., 496 F.3d at 946; N.C., 473 F. Supp. 2d at 546.  The court in N.C. reached this conclusion even though the student had been suspended on three occasions.  In R.B., the court relied upon evidence that the student had passing

grades, with only one D, with average or better achievement test scores.  <u>R.B.</u>, 496 F.3d at 946.  In this case, as well, M.W. had passing grades and Mitchell testified that testing showed M.W.'s achievement was commensurate with his cognitive ability.

Even affording due weight and deference to the decision of the IHO, this court is strongly convinced that his ruling is erroneous based upon the evidence presented at the evidentiary hearing.

   IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion for Summary Judgment (#13) is GRANTED.  This court concludes that the evidence presented to the IHO does not support his conclusion that M.W. suffers from an emotional disturbance under the IDEA and is eligible for services under the IDEA.

(2) This case is terminated.

ENTERED this 17th day of January, 2008

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

27